# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50160 | **DATE** | 9/12/2011 |
| **CASE TITLE** | Lewis vs. Snyder, et al. | | |

**DOCKET ENTRY TEXT:**

Defendants' motion for summary judgment [140] is granted as to Counts I, II, IV, and V. Count III is dismissed without prejudice. This case is closed.

■ [ For further details see text below.]

Docketing to mail notices.

## STATEMENT

In his fifth amended complaint, plaintiff, Peter A. Lewis, an inmate at Dixon Correctional Center ("Dixon"), alleges that defendants, Roger E. Walker, Jr., Director of the Illinois Department of Corrections ("IDOC"); Jerry L. Sternes,[1] Warden at Dixon; Dirk Dusing, a Major at Dixon; Curt Eubanks, a Legal Liaison at Dixon; Nedra Chandler, Assistant Warden at Dixon; and Larry Jones, Chaplain at Dixon, violated his right to freely exercise his religious beliefs as a Nazarite. The complaint includes five counts, each alleged to be "against the Defendants" generally, that arise primarily out of the decision by Dixon officials to require plaintiff to cut his dreadlocks in accordance with Dixon's Individual Grooming Policy. Currently before the court is defendants' motion for summary judgment on all counts. For the reasons stated below, the court grants the motion as to Counts I, II, IV, and V. Count III remains dismissed without prejudice.

### I. BACKGROUND[2]

Plaintiff is currently incarcerated at Dixon for numerous felony convictions, and he had amassed a lengthy disciplinary record at the prison prior to the events that give rise to this lawsuit. Plaintiff has sincere religious beliefs that are based on having taken the Nazarite Vow. One of those beliefs is that his "hair locks" are not to be cut, and as a result, he lets his hair grow out and then wears it in dreadlocks. This hairstyle has caused plaintiff to encounter some problems at Dixon since the staff believes that plaintiff's dreadlocks are a security risk because they cannot be properly searched for contraband.

The first problem plaintiff encountered is that defendant Eubanks denied plaintiff visitation on at least two occasions in the fall of 2003 after he told plaintiff that his hair was not searchable. At that time, Institutional Bulletin No. 00-222 was in effect, and it provided that "[t]o maintain conformity and provide for appropriate security standards . . . inmates will not be allowed to enter the Visiting Room wearing braids." Plaintiff also was aware, based on the denial of a previously filed grievance regarding visits, that certain hairstyles such as his were not allowed in the visiting room based on security concerns.[3] In addition, one of the provisions in a settlement agreement between plaintiff and IDOC in a previous lawsuit made clear that "[IDOC] will allow the Plaintiff to have visits in accordance with IDOC rules and regulations including but not limited to the Plaintiff taking down

his hair so it can be readily searched before and after visits." The record reflects that plaintiff has not had any visitors since 2003, although plaintiff claims this is because it would have been too burdensome to have family travel to visit him only to be denied visitation when they arrived.

Plaintiff's next hair-related problem occurred on January 22, 2004, when he agreed to allow the inmate barber to cut his hair after Dixon staff notified plaintiff that it would be enforcing an Individual Grooming Policy on plaintiff, pursuant to Department Rule 502.110 and Administrative and Institutional Directives 05.03.160, because his hairstyle was determined to be a security risk. The Individual Grooming Policy provides, in relevant part, that "[t]he Chief Administrative Officer, in consultation with the Chief of Operations, may determine that an individual grooming policy is necessary for any offender whose hairstyle . . . [p]oses a security risk." See Institutional Directive 05.03.160 ¶ 2.F.2(c). The Policy further provides that:

Security risks shall include occasions where:

   a.   The hairstyle impedes or prevents staff from conducting a thorough search of the
        hair for contraband;

   b.   Contraband hidden in the hair may not be detected; [or]

   c.   Contraband hidden in the hair may injure staff attempting to search the hair . . . .

See id. ¶ 2.F.3. Procedurally, the Policy provides that "[o]ffenders shall be notified, both verbally and in writing, to voluntarily remove the hairstyle or voluntarily submit to removal or cutting of the hairstyle by facility barber services." Id. ¶ 2.F.8. Absent exigent circumstances, the offender is given an initial 48-hour period in order to comply with this provision, and the offender may be given a second 48-hour period. Id. ¶ 2.F.8(a). An offender who refuses or fails to comply with the grooming policy after the two 48-hour compliance periods "may be subject to forcible removal or cutting of the hairstyle." Id. "Immediate compliance with the individual grooming policy may be required when exigent circumstances exist." Id. ¶ 2.F.8(b); see also id. ¶¶ 2.G.5; 2.G.6. Exigent circumstances are defined in the Policy to include, among other things, "an offender's imminent court or transfer date." Id. ¶ 2.E.

When Dixon staff enforced the Individual Grooming Policy on plaintiff on January 22, 2004, they were under the mistaken belief that plaintiff had a court appearance on January 26, 2004, for a civil case he was prosecuting in federal district court.[4] On August 1, 2003, the district court issued a writ for plaintiff to appear on January 26, 2004, for trial. However, during a telephonic conference on January 6, 2004, the court vacated the trial date and rescheduled it for March 15, 2004. The order vacating the trial date, which effectively also vacated the writ, was entered on January 14, 2006, and received by Dixon staff on January 16, 2004. Unfortunately, the Record Office, which coordinates scheduling of writs, did not remove plaintiff's appearance from the schedule. Consequently, on January 22, 2004, a Security Summary for Escorts was prepared for plaintiff, indicating he would be escorted to the district court on January 26, 2004. On that same day, Sternes was notified of plaintiff's court date, gathered information concerning plaintiff's hair, and, in consideration of the safety and security of Dixon and the staff, decided to implement the Individual Grooming Policy. At the time he made this decision, Sternes was not aware that the writ had been vacated.[5]

After making his decision, Sternes directed Dusing to start the Individual Grooming Policy on plaintiff. Dusing, along with Lieutenant Diehl, who is not named as a defendant, met with plaintiff, provided him with the required Individual Grooming Policy Notice, and explained to him the policy and procedures involved and that he would have to cut his hair.[6] Dusing also explained the consequences to plaintiff if he failed to comply with the order to cut his hair, which would have included a disciplinary report for disobeying a direct order and placement in segregation. Plaintiff was very upset with the prospect of having to cut his hair and advised Dusing that he could not cut his hair for religious reasons and that his court writ had been canceled.[7] Despite his protests, plaintiff eventually agreed to let the inmate barber cut his hair.[8] After his hair was cut, plaintiff requested that

| STATEMENT |
|---|

the dreadlocks be returned to him for religious purposes. Sternes agreed to let plaintiff keep one of his dreadlocks as a religious accommodation, and the remainder were mailed out under plaintiff's direction to his mother.

In addition to issues with his hair, plaintiff's complaint alleges that he has been denied the right to participate in religious feasts. According to his affidavit, plaintiff's beliefs require him to celebrate the following religious feasts: "Passover, feast of unleavened bread, feast of weeks, feasts of first fruits, feasts of tabernacle, the Sabbath day, the feast of atonement, feast of first root (Pentecost), and feast of every month." At Dixon, however, inmates may only participate in services for their particular faith designation. Plaintiff, as part of his settlement agreement with IDOC in a previous case, entered into the following agreement regarding his religious designation:

> IDOC shall issue Plaintiff an inmate identification card with a blank space for a religious designation. Plaintiff shall continue to be subject to the same rules and policies as other inmates on attendance at religious services and religious activities including Department Rule 425.30 (20 Ill. Admin. Code, Ch. 1, Sec. 425.30) which provide that committed persons generally may only attend the religious service/activities of their designated religious affiliation or non-denominational religious services/activities.

All inmates that want to participate in a religious holiday or observance are required to make a request to the chaplaincy department at least 45 days prior to the requested accommodation, who would review the request to see if it complies with the policies and procedures in the applicable Department Rule. Defendant Jones, the Chaplain at Dixon, testified that plaintiff has sent him several requests for various religious accommodations, but he could not recall specifically whether he ever requested to participate in a specific feast.

In his fifth amended complaint, plaintiff makes several general allegations that "the Defendants" violated his rights, but he falls short of explaining which defendants violated which specific rights.[9] In Count I, plaintiff appears to make a claim, pursuant to 42 U.S.C. § 1983 and presumably the First and Fourteenth Amendments, that the defendants violated his civil rights by cutting his hair. Plaintiff requests money damages and that defendants be enjoined from interfering with plaintiff's exercise of his religious beliefs by not cutting his hair and not denying him visitation on account of his dreadlocks.[10] In Count II, which is nearly identical to Count I, plaintiff alleges a breach of the Illinois Religious Freedom Restoration Act ("RFRA"), 775 ILCS 35/1 et seq. In Count III, plaintiff alleges that defendants breached a settlement agreement from a previous lawsuit by denying him visitation and requiring him to cut his hair. Defendant acknowledges that this court previously dismissed this count, and therefore, the court will do so again.[11] In Count IV, plaintiff alleges a violation of the Religious Land Use and Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, based on defendants cutting his hair, failing to return his cut hair to him, denying him visitation, and failing to properly designate him as a Nazarite on his identification card. Finally, in Count V, plaintiff alleges a violation of his rights to equal protection because he has been denied visitation due to his dreadlocks while other prisoners with long hair are allowed visitation.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

# STATEMENT

## B. Burden on Religious Exercise

In Counts I, II, and IV, plaintiff claims that defendants have substantially burdened his religious exercise in violation of the First Amendment, the RFRA, and RLUIPA, respectively. The court will begin its analysis with plaintiff's RLUIPA claim,[12] as the court's decision on this claim disposes of the remainder of these related claims.

### 1. Count IV – RLUIPA

RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Here, defendants do not dispute that requiring plaintiff to cut his hair prior to any visitation or a court appearance imposed a substantial burden on plaintiff's religious beliefs. On the other side, plaintiff does not dispute, nor could he do so legitimately, that defendants have a compelling interest in maintaining safety and security at Dixon by prohibiting inmates from possessing contraband that could be hidden in their hair. See, e.g., Thomas v. Winters, No. 04-3049, 2006 WL 563035, at *4 (C.D. Ill. Mar. 8, 2006) ("Protecting prison officials and preventing inmates from possessing contraband and weapons are unquestionably compelling government interests."); see also Williams v. Snyder, 367 F. App'x 679, 683 (7th Cir. 2010) (noting that "matted hair puts guards and inmates at a significant risk of injury from concealed weapons and other contraband); Johnson v. McCann, No. 08 C 4684, 2010 WL 2104640, at *5 (N.D. Ill. May 21, 2010) ("Dreadlocks are thick and coarse, and provide an ideal hiding place for contraband such as drugs, sharp plastic objects, needles, knives and makeshift blades, and even black thread (which can be coated in toothpaste and left to harden, creating handcuff-saws)." Therefore, the dispute in this case concerns whether Dixon's policies regarding inmates' hair are the least restrictive means of furthering the government's interest in maintaining security at the prison.

Defendants have presented evidence through their deposition testimony that the only way to protect against contraband in an inmate's hair is to be able to search the hair by running their fingers through the hair. If an inmate's hair makes it impossible to conduct this search, and the inmate cannot undo the hairstyle, then the least restrictive means of furthering the government's security interest is to cut the hair so that it can no longer be used to conceal contraband.[13] Several other courts that have considered similar inmate grooming policies have also concluded that cutting the hair is the least restrictive means of furthering the compelling government interest. See, e.g., Williams, 367 F. App'x at 683; Thomas, 2006 WL 563035, at *4; Clark v. Briley, No. 03 C 3852, 2005 WL 2369330, at *5 (N.D. Ill. Sept. 26, 2005); see also Collins-Bey v. Thomas, No. 03 C 2779, 2004 WL 2381874, at *3 (N.D. Ill. Oct. 25, 2004) ("As best as we can determine, every Circuit to address the issue has held that regulations of inmate hair length satisfy the least restrictive means test."). The court agrees with these cases and finds that requiring an inmate to cut his hair when it is otherwise unsearchable is the least restrictive means of furthering the institution's security interest.

Plaintiff first argues that cutting his hair was not the least restrictive means of furthering the government's security interest because, as he states in his affidavit, "[his] locks were at all times searchable, they could be felt and bent and twisted to make sure that nothing was concealed therein." Although plaintiff is clearly attempting to create a genuine issue of material fact, "[t]he court must afford great deference to prison officials regarding what constitutes a security risk in prison and how that risk is best reduced." Thomas, 2006 WL 563035, at *4

(citing Conyers v. Abitz, 416 F.3d 580, 584 (7th Cir. 2005)); see also Bell v. Wolfish, 441 U.S. 520, 547 (1979) (explaining that prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). Here, defendants do not contest that plaintiff's hair was "searchable," but they do contend that plaintiff's hairstyle did not allow for the type of thorough search, such as running fingers through the hair, that would further the prison's security interest. As Lieutenant Diehl stated in his deposition when referring to plaintiff's hair, "Everything is searchable. However, you have to have some degree of certainty that after you search something that you're sure there's nothing there to be found. And in this case you couldn't do that. . . . Could I search it and be sure that there was nothing in his hair? No. But I could search it, yes." When Diehl was asked how he could search someone's dreadlocks, he explained that "[t]he only thing you could do is feel it. But you wouldn't know if he had drugs in there, you couldn't tell if it was a lump of hair or a pill or a capsule or what. So, yeah, you could search it, but you wouldn't be absolutely sure that you would find or not find what was there."

Because plaintiff does not offer any evidence to show that a manual search of his hair would have been as effective at furthering the prison's security interest as implementation of the Grooming Policy, and bearing in mind the level of deference this court is required to give to prison officials on security matters, the court finds that in this case "neither a court nor a jury may second guess the defendants' determination that Plaintiff's hair could not be adequately searched unless it was cut." Thomas, 2006 WL 563035, at *4; see also Johnson, 2010 WL 2104640, at *6 ("One might argue that regular individual inspections of inmates with long hair would prove a less restrictive means of maintaining prison security than blanket grooming policies like the one at issue in this case. Though such a policy would no doubt be less restrictive from the perspective of the inmates affected, it would not adequately address the legitimate safety concerns of prison officials.").

This court also agrees with the court's assessment in Johnson that a grooming policy is the least restrictive means of satisfying security needs and that there are no reasonable alternatives:

> Individual, manual searches would be inferior to the general grooming policy for multiple reasons. First, given the large number of inmates at prisons . . . requiring individual searches would enable inmates to hide contraband or weapons in their hair in-between inspections. Second, guards could be cut or otherwise injured in running their hands through hair that contained a sharp object. Third, individual searches would strain the IDOC's limited resources by adding to correctional officers' already-full plate. Prison administrators may take costs and manpower into account when implementing regulations and procedures. Fourth, every occasion requiring close, physical contact between prisoners and guards raises the chance of violence occurring.
>
> Other possible alternatives are equally ineffective. A metal detector would, of course, find only metal objects in hair, not drugs, plastic, glass, or thread. Self-administered searches by inmates would be inadequate because inmates could avoid "discovering" any contraband concealed in their hair.

Johnson, 2010 WL 2104640, at *6 (citations omitted).

Plaintiff also argues that cutting his hair on January 22, 2004, was not the least restrictive means possible because his court date had been canceled, and thus, he did not need to have his hair cut. This argument misconstrues the language of the Dixon Individual Grooming Policy. Under the terms of the Policy, an inmate's hair is to be cut whenever it poses a security risk. The Policy is not specifically tied to court appearances, and although the safety and security concerns might be greater when an inmate leaves the confines of the prison, those same concerns are still present even when the inmate is within the prison population. It is true that the Policy includes an "imminent" court date among the examples of a potential exigent circumstance, but that would

only act to expedite implementation of the Policy. Contrary to plaintiff's argument, a court date is not a prerequisite to the application of the Policy.[14] In any event, plaintiff does not dispute that defendants were acting under the belief that plaintiff was required to go to court, and at best he has only demonstrated that defendants or someone else at Dixon were negligent for failing to recognize that his court date had been canceled.[15]

The court likewise finds that defendants did not violate RLUIPA by failing to return all of plaintiff's cut dreadlocks to him. Although there is no specific policy dealing with cut hair that the court has been made aware of, the same safety and security considerations underlying the Individual Grooming Policy apply with equal force when the dreadlocks have been removed from an inmate's head. To the extent the dreadlocks were unable to be properly searched while on the inmate's head, they would remain in the same condition once removed from the head. Thus, not allowing defendant to retain possession of his dreadlocks in his cell was the least restrictive means of furthering the government's interest in security. Although defendants did try to reasonably accommodate plaintiff's religious beliefs by allowing him to keep one dreadlock, and by sending the remaining dreadlocks to plaintiff's mother, they were not required to do so. Moreover, the fact that defendants made a special exception to their security interests in order to allow him to keep one dreadlock does not demonstrate that allowing him to keep all of his dreadlocks, as plaintiff suggests, would have effectively furthered their security interest.

Finally, with respect to the religious feasts plaintiff claims he was denied, the evidence submitted demonstrates that plaintiff, through his own choice as part of the settlement agreement, does not have a religious designation listed on his identification card. Thus, as a general rule, plaintiff was not allowed to participate in any religious-oriented feasts. See 20 Ill. Admin. Code § 425.30(f) ("Committed persons may only attend the religious activities of their designated religion or non-denominational religious activities . . . ."). This administrative rule furthers the interest of maintaining order and security at Dixon by preventing inmates from interfering with other inmates' religious beliefs and practices, and it allows the prison facility time to prepare for any special dietary needs. For most inmates, this rule does not restrict their religious beliefs in any way because they would be allowed to participate in their designated religious feasts. For plaintiff, however, because he did not have a religious designation, it did impact his ability to exercise his religious beliefs. Nevertheless, the rule allows an inmate to file a written request to participate in a religious activity of a faith other than their designated faith, see id. § 425.30(g), but there has not been sufficient evidence presented on which a reasonable jury could conclude that plaintiff properly made such a request.[16] Accordingly, the court finds that the administrative rule, which does not ordinarily restrict an inmate's religious beliefs in any way if the procedures of the rule are followed, is the least restrictive means of furthering the government's compelling interest in institutional order and security.

Based on the foregoing, the court concludes that no reasonable jury could find in favor of plaintiff on his RLUIPA claim, and the court grants defendants' motion for summary judgment as to Count IV.

2. Count I – First Amendment

Plaintiff's claim in Count I of his fifth amended complaint appears to be a claim that Dixon officials violated his First Amendment right to freely exercise his religion. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). "This is not a demanding standard, and it implies that if . . . the regulation limiting the length of male inmates' hair strikes a reasonable balance between the interest in religious liberty and the needs of prison safety and security, he must lose on his free-exercise claim." Reed v. Faulkner, 842 F.2d 960, 962 (7th Cir. 1988).

Because the court has already found, with respect to plaintiff's RLUIPA claim, that the prison rules that required plaintiff to cut his hair were the least restrictive means of furthering a compelling government interest in safety and security, plaintiff is unable to show that those rules are not reasonably related to legitimate

penological interests. See Thomas, 2006 WL 563035, at *5 ("[T]he haircut did burden the plaintiff's ability to practice his religion, but it did not violate his rights under RLUIPA or the First Amendment (an easier test for the defendants)."); Clark, 2005 WL 2369330, at *3 (noting that RLUIPA "provide[s] inmates with even greater protection of their religious rights than that afforded by the First Amendment"). Accordingly, the court grants defendants' motion for summary judgment as to Count I.

### 3. Count II – RFRA

The RFRA provides the same protections as RLUIPA and prohibits the government from substantially burdening the exercise of religion "unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." 775 ILCS 35/15. Thus, for the same reasons plaintiff's RLUIPA claim fails, his state-law claim under the RFRA also fails. Accordingly, the court grants defendants' motion for summary judgment as to Count II.

### C. Equal Protection

Plaintiff's claim in Count V of his fifth amended complaint is somewhat of a moving target. In his complaint, plaintiff specifically alleges that defendants violated his right to equal protection "by treating him differently than other prisoners with long hair," because prisoners with long hair have not been denied visitation or been forced to cut their hair. This claim lacks merit. "[E]qual protection claims . . . are based on the principle that, under like circumstances and conditions, people must be treated alike, unless there is a rational reason for treating them differently." LaBella Winnetka, Inc. v. Vill. of Winnetka, 628 F.3d 937, 941 (7th Cir. 2010) (quotation marks omitted). Here, plaintiff has failed to demonstrate that he was treated differently from any similarly situated people. See id. As defendants made clear in their depositions, the policies relating to hairstyles at Dixon are not based on the length of the hair, but rather on the ability to search the hair. Thus, an inmate with long hair that is not tied up into dreadlocks is not similarly situated to plaintiff, because the guards could run their fingers through that inmate's hair. Merely alleging that other inmates with long hair were not denied visitation or forced to cut their hair does not demonstrate that plaintiff has been denied equal protection.

In his response to defendants' motion for summary judgment, plaintiff changes the focus of his equal protection claim and now asserts that he is "treated differently than those belonging to a class of faiths that the Defendants recognize," which prevents him from being allowed to participate in certain religious feasts. Under this variation, it is difficult to discern how plaintiff's claim is any different from his claims under the First Amendment or RLUIPA. See Conyers v. Abitz, 416 F.3d 580, 586 (7th Cir. 2005) ("[T]he free-exercise claim arises under the First Amendment and gains nothing by attracting additional constitutional labels." (citing Graham v. Connor, 490 U.S. 386, 395 (1989))). Moreover, plaintiff has not shown that he is treated any differently than other inmates who have chosen to not list a religious designation on their identification cards. See LaBella Winnetka, 628 F.3d at 941. To the extent plaintiff is arguing that IDOC should recognize his Nazarite vow as a designated religion on his identification card (even though plaintiff admits that "[i]t's not a religion"), plaintiff has failed to present any evidence that any of the named defendants are responsible for the list of permissible designations.

For all these reasons, the court finds that plaintiff is not entitled to relief on his underdeveloped equal protection claim. Accordingly, the court grants defendants' motion for summary judgment as to Count V.

### III. CONCLUSION

Based on the foregoing, defendants' motion for summary judgment is granted as to Counts I, II, IV, and V; Count III is dismissed without prejudice.

1. Plaintiff misnamed this defendant in his complaint as "Jerry L. Stern." The court will use the correct name throughout this order.

2. The background facts are taken from the parties' Local Rule 56.1 statements of material fact, as well as the exhibits attached thereto, and are either undisputed or have been viewed in the light most favorable to plaintiff, the non-moving party.

3. In response to another grievance filed in 2006 regarding visits, a grievance counselor specified that "dreadlocks are not authorized in the Visit Room area."

4. Because plaintiff immediately complied with the order to cut his hair, it is unclear whether defendants considered a court appearance in four days to constitute exigent circumstances. However, Dusing testified that plaintiff would have been given the normal, 48-hour compliance period if he did not immediately comply, suggesting that it was not considered to be exigent circumstances.

5. Although Sternes' deposition transcript is attached as an exhibit to defendants' statement of material facts, it appears that every other page is missing, including page 38, the page cited by defendants in support of this fact. Nevertheless, plaintiff, who presumably has the entire deposition transcript, has admitted this fact in his response to the statement of material facts so the court will rely on it as well.

6. Plaintiff was given the opportunity to remove his dreadlocks, but he was unable to do so and did not even attempt this option.

7. Several of the individual defendants stated that the Individual Grooming Policy would not have been enforced on plaintiff if he was not scheduled to go to court on the writ. However, these same defendants deny that plaintiff ever told them that his court writ was canceled, even though plaintiff claims that he did. In any event, even though the court date was canceled, plaintiff was still transported to the courthouse on January 26, 2004, thereby raising the same security concerns and further indicating that Dixon staff, at least subjectively, were unaware of the change.

8. Plaintiff argues that he did not voluntarily agree to cut his hair, but only did so because of the threats of disciplinary action if he refused. It is undisputed, however, that plaintiff did sign the Notice form, which clearly indicates that plaintiff would allow the inmate barber to cut his hair. In any event, plaintiff's subjective state of mind at the time he was presented with the order to cut his hair is not relevant to whether defendants violated plaintiff's right to freely exercise his religious beliefs.

9. Although this vague pleading normally would be problematic, because none of plaintiff's claims have any merit, the court need not require plaintiff to cure these deficiencies.

10. Plaintiff also requests that his "religious materials be returned to him." The court will assume this refers to his cut dreadlocks that were sent to his mother, as plaintiff has not directed the court to any evidence in the record concerning any other sort of confiscation of religious materials.

11. The Seventh Circuit has consistently held that dismissed claims do not need to be included in an amended complaint in order to be preserved for appeal. See <u>Serritella v. Markum</u>, 119 F.3d 506, 512 n.6 (7th Cir. 1997).

12. Defendants correctly point out that RLUIPA does not authorize suit against the defendants in their individual capacities, see Nelson v. Miller, 570 F.3d 868, 889 (7th Cir. 2009), and that the Eleventh Amendment precludes plaintiff from recovering money damages against these defendants in their official capacities, see Sossamon v. Texas, 563 U.S. __, 131 S. Ct. 1651, 1655 (2011). Thus, plaintiff's claim in Count IV would be limited to seeking injunctive relief.

13. Dixon does not prohibit dreadlocks, per se, as defendant Chandler, who is the current warden at Dixon, testified that "some dreads are thin, some dreads are short and you [can] still search" inmates with those hairstyles.

14. The fact that some defendants stated that the Individual Grooming Policy would not have been enforced on plaintiff if he did not have a court appearance does not demonstrate that the enforcement of the Policy in this case was erroneous, especially considering that plaintiff was actually transported to the courthouse based on the original writ. At best, this might call into question the individual decisionmaking of the prison officials in this case, but it does not lessen the compelling government interest that the Policy is designed to promote. See S. Ridge Baptist Church v. Indus. Comm'n of Ohio, 911 F.2d 1203, 1209 (6th Cir. 1990) (explaining that a limited exception to a general policy "does not diminish the state's compelling interest" in the policy). In any event, there is no evidence to suggest that transporting plaintiff to court was a pretense to enable defendants to cut his hair. At the time they implemented the policy, defendants subjectively had a legitimate and sincere belief that plaintiff had to be taken to court.

15. Although plaintiff did not make such a request at the time, plaintiff also argues that prison officials should have given him the option to dismiss his civil case so he could have preserved his hair, and that this would have been less restrictive. The court disagrees because dismissing his civil case would have done nothing to ensure the safety and security of Dixon staff and inmates from contraband that could have been concealed in plaintiff's hair, and as discussed above, the lack of a court date did not make the Grooming Policy inapplicable.

16. Although plaintiff testified generally in his deposition that he did make written requests to celebrate his religious feasts, there is no record of these requests or the reason for the alleged denial, and plaintiff fails to provide any further details, such as what particular feast he requested, when was the request made, or who denied his request. "Conclusory allegations, unsupported by specific facts, will not suffice" to defeat a summary judgment motion. Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)). Moreover, in his affidavit, plaintiff avers that his "desire to participate in religious feasts was made known to Chaplain Jones," but that "Chaplain Jones never told me I had to submit my request to participate in feasts in writing else he would deny such requests." This statement shows that plaintiff did not make written requests, which is inconsistent with and further undermines plaintiff's unsupported deposition testimony. Finally, there is no indication that the requests complied with the administrative rules by being made at least 45 days in advance of the requested feast. See Jordan v. Keim, No. 04-CV-775-DRH, 2009 WL 2447954, at * (S.D. Ill. Aug. 7, 2009) (finding that the 45-day request period for religious feasts was "reasonable in length," that there was a "valid, rational reason for the regulation," and that "reasonable alternatives to the 45 day request period do not exist" (quotation marks omitted)).